370 So.2d 216 (1979)
Rufus PALOMBO et al., Plaintiffs-Appellees,
v.
Joseph BROUSSARD et al., Defendant-Appellant.
No. 6953.
Court of Appeal of Louisiana, Third Circuit.
April 11, 1979.
*217 McBride & Brewster, Norman P. Foret, Lafayette, for defendant-appellant.
Cooper & Sonnier, Silas B. Cooper, Jr., John E. Ortego, Abbeville, for plaintiffs-appellees.
Ronald E. Dauterive, Allen, Gooch & Bourgeois, Paul J. Breaux, Voorhies & Labbe, D. Mark Bienvenu, Lafayette, for defendant-appellee.
Before WATSON, GUIDRY and FORET, JJ.
FORET, Judge.
This is a suit for damages resulting from an automobile accident which occurred on March 19, 1976, on Louisiana Highway 14 between Abbeville and Kaplan, Louisiana. Plaintiffs, Mr. and Mrs. Rufus Palombo, were passengers in a Buick automobile owned and being operated by Francis Lachaussee, whose wife was also in the vehicle. While traveling on Highway 14, Lachaussee's automobile was run into by a vehicle owned and being driven by defendant, Joseph Broussard, who had failed to yield the right of way when the highway he was traveling on (La. Highway 343) intersected Highway 14. Broussard's negligence was the sole and proximate cause of the accident. These facts are not in dispute.
Made defendants in the suit were: (1) Joseph Broussard, (2) Fireman's Insurance Company the liability insurer of Broussard's automobile with a $10,000 per person/$20,000 per accident (10/20) coverage, (3) Bellefonte Insurance Company liability and uninsured motorist carrier of the Palombos, two policies each with 5/10 coverage, (4) State Farm Mutual Automobile Insurance Company Liability and uninsured motorist carrier of the Lachaussees' two automobiles (the Buick and a Chevrolet) under two separate policies, both with 25/50 liability and UM coverages.
Prior to trial, plaintiffs settled their claims against Bellefonte; Fireman's settled with the Lachaussees for $7,500, leaving $12,500 (which was ordered paid to the plaintiffs by the trial court's judgment).
*218 The only substantial issue on appeal, as it was in the trial court, is the amount of coverage that State Farm has available for the four injured persons.
It is not seriously disputed that all four individuals received extensive injuries as a result of this accident: State Farm's adjuster, John Soileau, settled with the Lachaussees for $35,000 and admitted that the Palombos' injuries were more serious, with Mr. Palombo being the most severely injured (the trial court determined that the plaintiffs were entitled to $69,809.44 from the defendants, excluding Bellefonte). As the tortfeasor had only the 10/20 Fireman's policy, the four victims are entitled, under La.R.S. 22:1406 D, to turn to their own uninsured motorist (UM) insurance carriers for compensation (with the right of the UM carrier to seek reimbursement from the tortfeasor).
As mentioned above, the issue before this Court involves the amount of coverage State Farm has available for the injured. State Farm claims that since it settled with the Lachaussees for $35,000 from the 25/50 UM policy on the Buick (the car involved in the accident), there remains but $15,000 for the Palombos, which amount it tendered to the Palombos prior to trial, but was refused. The Palombos contend that State Farm acted unreasonably and in bad faith in its settlement negotiations in that it purposely stalled the plaintiffs so as to settle first with the Lachaussees. The importance of settling first with the Lachaussees was that the total amount of coverage available from State Farm for the Palombos was the 25/50 UM policy on the Buick, while there was up to $100,000 UM available to the Lachaussees ("stacking" the State Farm policies on their Buick and Chevrolet).[1]
The actual circumstances surrounding negotiations are essential to resolving the legal issues and we take the liberty of quoting, at some length, the trial court's factual findings (as set forth in its reasons for judgment):
"A little over six months after the accident, the attorneys for the plaintiffs conveyed a settlement offer to State Farm through its adjuster on this particular case, John Soileau, which would have required State Farm to pay $40,000.00 and they asked for a response within two weeks. At this time, only State Farm was aware of the fact that the Lachaussees' second policy was applicable to the accident, at least in favor of the Lachaussees. The latter were "insureds" under the uninsured motorist provisions of both policies; both could be "stacked" in their favor. However, the Palombos were "omnibus insureds" only under the policy on the car involved in the accident and could not "stack" both policies. Thus, State Farm had coverage of $100,000.00 applicable to the accident; $50,000.00 was available to the Palombos under the Buick policy and $100,000.00 was available to the Lachaussees under both policies. At the time of the plaintiffs' settlement offer to State Farm, which was below the limits of the Buick policy, the latter had received no offer from the Lachaussees. During this period, John Soileau made an evaluation of the injuries of all the parties. He concluded, and so informed his immediate superiors, that Rufus Palombo had the most serious injuries and valued his claim at approximately $50,000.00. The other parties' injuries were valued at approximately $25,000.00 each. With all other parties still unaware of the second policy, State Farm opened up reserves of $100,000.00 on the two policies and instructed John Soileau not to settle with the Palombos until he had first settled with the Lachaussees. Soileau then contacted the Lachaussees and received a settlement offer of $60,000.00. However, at no time during the settlement negotiations were the Lachaussees [[2]] informed of the applicability of the second policy. Soileau testified *219 that the Lachaussees did ask if the second policy were applicable but that he told them State Farm wasn't sure because of a pending case on the issue, Seaton v. Kelly, 339 So.2d 731 (La.S.Ct.1976), which was ultimately decided on November 8, 1976. However, Seaton did not involve the question of whether someone such as the Lachaussees could "stack" their policies but involved the question of whether someone in the position of the Palombos could "stack" both policies. The court concluded that they could not since, under the language of the insurance contract (which is the same as in the instant case), guest passengers were only "omnibus insureds" under the policy covering the car involved in the accident. Hence, State Farm knew, and withheld [this knowledge] from the Lachaussees, that both policies could be "stacked" by the latter. State Farm told the Lachaussees that only $50,000.00 was available "for all four parties". Concerned for the Palombos, their close friends for years, aware of their serious injuries and believing only $50,000.00 was available for all parties concerned, the Lachaussees settled their claims for $35,000.00. State Farm then tendered $15,000.00 to the plaintiffs, whose suit had been postponed at the request of John Soileau who was under specific orders not to settle with the Palombos until he had settled with the Lachaussees. Thus, despite the fact that plaintiff offered to settle for an amount lower than the limits of the first policy, and lower than State Farm's own evaluation of the claims, the latter refused to settle with the Palombos solely for the purpose of reducing the insurance funds available."
The trial court went on to find that State Farm had owed a duty to the Palombos to act reasonably, fairly, and in good faith and that State Farm had breached its duty. Upon determining the extent of injuries suffered by the Palombos, it then held State Farm liable to them in the total amount of the policy ($50,000.00).
Upon appeal, State Farm argues that its method of settlement was proper and that only the remaining $15,000 of the Buick policy should be available to the plaintiffs.
We are unable to find legislation or jurisprudence in which the duty of a UM carrier to its insured is delineated. However, there are cases in Louisiana in which the duty of a liability insurer in circumstances similar to the instant case are set out:
"It is generally accepted that an insurer must carefully consider the interests of its insured, instead of only consulting its own self-interests, when handling and settling claims in order to protect the insured from exposure to excess liability. While the nature of the insurer's obligations toward the insured is not clearly defined, this Court has recognized that a liability insurer owes its insured a minimum duty to act in good faith and to deal fairly." Holtzclaw v. Falco, Inc., 355 So.2d 1279 (La.1977).
In a UM situation, the insured is also the claimant so that the duty owed by the insurance carrier is not the same as the duty owed by a liability insurer to its insured. In the liability situation, the insurer must be careful, in settling a claim, to protect its insured from excess liability (as well as considering its own self interest). Here, such a problem does not arise, however the duty of reasonableness and good faith should still apply as owed by the insurer to the claimants-insured under the policy. While agreeing with at least one scholarly writing,[3] that the effect of UM is to provide excess coverage for the tortfeasor, (but without a corresponding duty to him), the public policy behind acquiring UM coverage is not to protect the tortfeasor but to protect an innocent victim of an accident who is unable to obtain sufficient compensation from the tortfeasor.[4]
*220 When there are multiple claimants under a policy, a liability insurer may in good faith make reasonable settlements with some of the parties even if this has the effect of exhausting the insurance coverage to the prejudice of other claimants. Manieri v. Horace Mann Mutual Insurance Co., 350 So.2d 1247 (La.App. 4 Cir. 1977); Holtzclaw v. Falco, Inc., supra; Richard v. Southern Farm Bureau Casualty Ins. Co., 254 La. 429, 223 So.2d 858 (1969). We believe that this same duty should apply to settlement with claimants under UM coverage. What constitutes acting "reasonably" and "in good faith" in negotiating settlements with a claimant? Basically, one must look to the facts of the individual case. Here the trial court set out the facts as it found them (which findings we do not disturb, finding no reason to think them manifestly erroneous or clearly wrong). State Farm knew the extent of injuries suffered by the parties, and had a good estimate of the amount of compensation required. It knew the amount of coverage it had available to each individual, yet it did not convey to its insured this information (that all four persons were "insureds" under the express provisions of the Buick policy and the Lachaussees under the Chevrolet policy also). It stalled negotiations with the plaintiffs while requesting plaintiffs not file suit. After the judgment of the Louisiana Supreme Court in Seaton v. Kelly[5] where it was established that a passenger (such as the Palombos) could not "stack" the UM coverage of a second automobile owned by the owner of the occupied automobile, State Farm knew that the maximum it would have to pay plaintiffs was $50,000 while the Lachaussees were still entitled to stack both of their policies to have a total of $100,000 available.[6] Knowing this, State Farm, on November 22, 1976, settled with the Lachaussees, who the State Farm adjuster knew to be the less seriously injured couple, for seventy percent of the only policy available to the plaintiffs.
For this Court to call State Farm's action "good faith" would be a mockery of those words. We note with interest the definition of "bad faith" from Black's Law Dictionary which seems much more applicable to the present circumstances:
"BAD FAITH. The opposite of `good faith,' generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive."[7]
Other persuasive definitions of "bad faith":
"In its simplest form, bad faith means a breach of faith and a willful failure to respond to plain obligations." Hernandez v. Employers Mutual Liability Insurance Co., 346 F.2d 154 (5th Cir. 1965).
"Bad faith . . . a designed breach [of the contract] . . . from some motive of interest or ill will." La.Civil Code Article 1934(1).
Obviously State Farm engaged in practices which amount to "bad faith". We have little difficulty in rejecting such practices as engaged herein by State Farm.
The amount of damages suffered by the plaintiffs was determined to be $69,809.44, which figure is not contested by State Farm on appeal.
For the foregoing reasons, the judgment of the trial court is affirmed, and all costs *221 of this appeal are assessed against State Farm Mutual Automobile Insurance Company.
AFFIRMED.
NOTES
[1] Since the decision of the La. Supreme Court in Seaton v. Kelly, 339 So.2d 731 (La. 1976), the Palombos could not "stack" the State Farm policy on the Lachaussees' Chevrolet.
[2] Court of Appeal Footnote:

The Lachaussees were not represented by counsel.
[3] Legislative Symposium in 35 La. Law Rev. 618.
[4] Booth v. Fireman's Fund Ins. Co., 253 La. 521, 218 So.2d 580 (1968) wherein it was decided that a suit by an insured against his UM carrier is a suit ex contractu (and not ex delicto) as is a suit against a tortfeasor's insurance company under the La. Direct Action Statute.
[5] 339 So.2d 731 (1976).
[6] See Acts 1977 No. 623, Sec. 1 adding R.S. 22:1406 D(1)(c) which legislatively limits stacking.
[7] Compare this to the definition of "good faith" given by Black's:

"GOOD FAITH. Honesty of intention, and freedom from knowledge of circumstances which ought to put the holder upon inquiry.. . . An honest intention to abstain from taking any unconscientious advantage of another, even through technicalities of law, together with absence of all information, notice, or benefit or belief of facts which render transaction unconscientious. . . ."